**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SCB Derivatives, LLC, | |
| Plaintiff, | |
| v. | Case No.    22 CV 2742 |
| Andrew Bronson and Kieran Bracken, | |
| Defendants. | |

## COMPLAINT

Plaintiff SCB Derivatives, LLC ("SCB"), through counsel, hereby brings its Complaint against Andrew Bronson ("Bronson") and Kieran Bracken ("Bracken") and alleges as follows:

## NATURE OF THE ACTION

1.    SCB is a privately held leading global low carbon commodities business headquartered in Chicago, Illinois.  SCB focuses on creating and developing low carbon commodity markets as a route to de-carbonization and promoting the adoption of low carbon alternatives by reducing the frictional costs of low carbon practices through liquidity provision and pricing transparency.  It offers brokerage solutions to its clients by, *inter alia*, using derivatives to provide hedging tools against potential risk, as well as assisting with the sourcing or placement of physical product and credits.

2.    This case arises from the actions of two former SCB employees, Bronson and Bracken.  Bronson and Bracken were brokers in SCB's US Ethanol business, in which capacity SCB entrusted them with confidential information necessary for them to perform their duties.  Bronson and Bracken occupied special positions of trust and confidence within the firm.

3.    While employed by SCB, Bronson and Bracken devised and began to execute a plan. The first part of the plan was to ensure that SCB's US Ethanol business would be understaffed to limit its ability to compete in the market.  The second part of the plan was to leave SCB to join a competitor together.  The third part of the plan was to bring SCB's US Ethanol clients with them to that competitor.

4.    Immediately after their employment with SCB, Bronson and Bracken continued to execute the plan. They began working for a competitor of SCB.  On behalf of that competitor, they continued to solicit and do US Ethanol business with their SCB clients. As a result, Bronson and Bracken caused and continue to cause ongoing financial and other irreparable harm to SCB in violation of their legal and contractual obligations.  SCB brings this action to seek recourse for this unlawful conduct.

## THE PARTIES

5.    SCB is a Delaware limited liability company with its principal place of business located in Chicago, Illinois.

6.    Plaintiff is informed and believes that Defendant Bracken is a resident of Florida.

7.    Plaintiff is informed and believes that Defendant Bronson is a resident of Delavan, Wisconsin.

## JURISDICTION & VENUE

8.    This Court has diversity jurisdiction over SCB's claims against Bronson and Bracken pursuant to 28 U.S.C. § 1332 because SCB, Bronson, and Bracken are each citizens of different states and the sum or value of SCB's claims against Bronson and Bracken exceeds $75,000.

9.    Venue in the United States District Court for the Northern District of Illinois is proper because:

(a)     A substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred in this judicial district, rendering venue proper pursuant to 28 U.S.C. §§ 1391(b)(1) and (2); and

(b)     Bronson and Bracken expressly consented in their respective employment agreements with SCB that any disputes to enforce those agreements would be brought solely in any state or federal court in Illinois, and that they irrevocably submit to the exclusive jurisdiction of such courts and waive the defense of inconvenient forum with respect to them.

## FACTUAL ALLEGATIONS

**A.     SCB invests in client relationships and valuable confidential information.**

10.     Clients turn to SCB as a trusted source for knowledge and expertise regarding the eight major markets on which SCB focuses, including among them the US Ethanol market. SCB operates in a highly competitive industry where marketplace goodwill and confidential strategic, financial, and client information are critical to its success.

11.     SCB is successful in large part because it invests in long-term relationships with its clients.  The firm spends hundreds of thousands of dollars per year on developing, maintaining, and deepening its client relationships.  These investments include expenditures for marketing, conference attendance and presentations, client meetings, and national and international travel.

12.     SCB's client relationships, including those Bronson and Bracken were responsible for maintaining, generally take multiple years to develop and, once established, span several years.

13.     SCB also invests in client relationships by providing its brokers with access to confidential information about the market, clients, potential clients, and other buyers and

sellers in the market. Beginning in 2009 with the opening of its Chicago office, for example, SCB made substantial financial investments to gain, develop, and maintain industry-leading knowledge of the US Ethanol market, and of the investors in that market.

14. SCB's successful investments in client relationships and industry expertise have been broadly recognized. For example, SCB won the Energy Risk "Commodity Broker of the Year" award for 2020, 2021, and 2022.

15. As a result of these investments, SCB has developed and owns significant amounts of highly confidential information (the "Confidential Information" or "CI"), including but not limited to information pertaining to SCB's business methods, systems, software technology, financial reports, details of brokerage arrangements, current or planned transactions, and business development plans.

16. Some of this CI specifically relates to SCB's US Ethanol clients (the "Confidential Client Information" or "CCI"). The CCI includes but is not limited to:

    (a)    Revenue history by client and product;

    (b)    Details of client transaction history reflecting each client's buying and selling preferences, e.g., locations in which clients prefer to sell, selling price relationships between one location and another, sale volumes, preferences regarding ethanol delivery methods;

    (c)    Specific names, locations, and contact information for key client contacts.

17. This Confidential Client Information, extensively developed and owned by SCB, would allow a competing entity to undermine years of SCB's work and unfairly avoid having to

make seven-figure financial and interpersonal investments over several years to legally and independently develop comparable information and expertise.

18. In order to safeguard the confidentiality of its CI and CCI, and to protect its interest in its client relationships, SCB:

    (a)    requires its brokers to sign agreements regarding confidentiality, competition, and the solicitation of clients and customers;

    (b)    maintains the information on secure systems that can only be accessed by SCB hardware with the use of two-factor authentication;

    (c)    trains its brokers regarding the secure and appropriate use of SCB's various IT systems; and

    (d)    restricts access to those with a clear business need for using the information.

**B.**     **SCB hires Bronson and Bracken into special positions of trust.**

19. In January 2015, SCB hired Bronson to work in Chicago, Illinois as a highly-compensated broker on SCB's US Ethanol business. SCB provided substantial and ongoing training to Bronson about the US Ethanol market during his employment. Before SCB hired Bronson, he had no work experience in the US Ethanol market.

20. From June to September 2016, SCB employed Bracken as a summer intern on the US Ethanol business while he was pursuing a master's degree at University College of Dublin, Ireland. SCB provided substantial and ongoing training to Bracken about the US Ethanol market during his employment. Before SCB hired Bracken, he had no work experience in the US Ethanol market.

21. In September 2017, after Bracken had completed his master's degree, SCB hired him full time as a broker on its US Ethanol business.

22.     As brokers on SCB's US Ethanol business, Bronson and Bracken were responsible for
identifying potential clients through research and cold-calls, developing and maintaining
client relationships over several years, matching buyers' and sellers' interests, executing
client orders, entering client trades, preparing market reports, and monitoring and
analyzing market trends and communicating them to customers. A substantial portion of
the information that Bronson and Bracken collected as a result of performing these duties
was CI and CCI.

23.     SCB invested significant time and substantial resources over a prolonged period to train
Bronson and Bracken and provide them with the knowledge and experience necessary to
perform their duties. This investment included providing them with access to substantial
quantities of CCI and CI that SCB spent millions of dollars and several years developing,
including the CCI for each of the US Ethanol clients whom they serviced. This CCI and
CI was necessary for Bronson and Bracken to perform their duties.

24.     In their respective roles, Bronson and Bracken occupied special positions of trust and
confidence within SCB.

25.     Bronson's and Bracken's contacts and relationships with SCB's US Ethanol clients
would not have occurred but for their employment with SCB.

26.     On July 12, 2021, SCB promoted Bracken to be the head of the US Ethanol business. As
the US Ethanol business head, Bracken retained all of his duties as a broker, had
additional compensation opportunities, and was entrusted by SCB with managerial
responsibilities over other brokers on the desk and increased access to CI and CCI. For
example, as the US Ethanol business head, Bracken had access to and was familiar with
the above-referenced CCI for all US Ethanol clients.

### C.    **Bracken and Bronson sign agreements with SCB regarding solicitation and confidential information.**

27.    Bracken and SCB entered into an Employment Agreement dated September 1, 2019

("Bracken's EA").  Pursuant to Bracken's EA, he agreed, *inter alia,* that:

(a)    In the course of his employment with SCB, Bracken would have access to

Confidential Information, including information pertaining to the business

methods, systems, software technology, financial reports, details of brokerage

arrangements, current or planned transactions, and business development plans.

The CI was and would remain the property of SCB.

(b)    During and after the term of his employment with SCB, Bracken would not

"disclose to any individual or entity . . . any [CI]" without SCB's prior written

consent.

(c)    Because of his experience with and relationship to SCB, Bracken would have

access to and learn about SCB's Confidential Client Information, including order

preferences, pricing information, and other information about facts and

circumstances specific to customers and relevant to providing brokerage services

to those customers.

(d)    Bracken understood that SCB takes reasonable steps to protect the confidentiality

of this CCI.

(e)    Bracken understood that the loss of a customer relationship or goodwill would

cause significant and irreparable harm to SCB.

(f)    For the term of Bracken's EA and six months thereafter, he would not "directly or

indirectly solicit, contact, or attempt to solicit or contact, using any form of oral,

written, or electronic communication . . . or meet with any of the [SCB's] current,

former, or prospective customers, with whom [he] interacted or about whom [he] learned any [CCI] during [his] employment, for the purposes of offering or accepting goods or services similar to or competitive with those offered by [SCB]" without SCB's prior written approval.

(g)     For the term of Bracken's EA and twelve months following its termination, he would not, "directly or indirectly, through another individual or entity, or otherwise solicit, entice, persuade, induce or attempt to induce any individual who presently is, or any time during the twelve (12) months preceding the termination of the Broker's employment with [SCB], shall have been a broker of [SCB] . . . to terminate or refrain from renewing or extending [their] employment with [SCB], or to become employed by or enter into contractual relations with any other individual or entity, and [he would not] approach any such broker for any of these purposes or authorize or knowingly cooperate in any manner with the taking of any such actions by any other individual or entity" without SCB's prior written approval.

(h)     Bracken's skills, professional experience, and relationships with SCB customers are unique.

(i)     The restrictions in Bracken's EA were reasonably drawn to protect SCB's legitimate business interests, Bracken fully understood them, and they would not preclude him from becoming gainfully employed following a termination of employment by SCB.

(j)     If any of the foregoing covenants were deemed invalid or unenforceable with respect to geographic scope or duration, that scope or duration should be reduced

to the extent necessary to make it valid and enforceable and in all other respects should remain in full force and effect.

(k)    Whenever possible, each provision of Bracken's EA should be interpreted in such a manner as to be effective and valid under applicable law.  If any provision was held invalid, illegal, or unenforceable for any reason, such holding should not affect any other provision and the agreement should be reformed, construed, and enforced as if such invalid, illegal, or unenforceable provision had never been included.

28.    Bronson and SCB entered into an Employment Agreement on January 25, 2020 ("Bronson's EA").  Pursuant to Bronson's EA, he agreed, *inter alia,* that:

(a)    In the course of Bronson's employment with SCB, [he] would have access to Confidential Information, including information pertaining to the business methods, systems, software technology, financial reports, details of brokerage arrangements, current or planned transactions, and business development plans. The CI was and would remain the property of SCB.

(b)    During and after the term of his employment with SCB, Bronson would not "disclose to any individual or entity . . . any [CI]" without SCB's prior written consent.

(c)    Because of his experience with and relationship to SCB, Bronson would have access to and learn about SCB's Confidential Client Information, including order preferences, pricing information, and other information about facts and circumstances specific to customers and relevant to providing brokerage services to those customers.

9

(d)     Bronson understood SCB takes reasonable steps to protect the confidentiality of this CCI.

(e)     The loss of a customer relationship or goodwill would cause significant and irreparable harm to SCB.

(f)     For the term of Bronson's EA and six months following its termination, he would not "without the prior written approval of the Board of Directors of [SCB], directly or indirectly solicit, contact, or attempt to solicit or contact, using any form of oral, written, or electronic communication . . . or meet with any of the [SCB's] current, former, or prospective customers, with whom [he] interacted or about whom [he] learned any [CCI] during [his] employment, for the purposes of offering or accepting goods or services similar to or competitive with those offered by [SCB]" without SCB's prior written approval.

(g)     For the term of Bronson's EA and twelve months following its termination, he would not, "without prior written approval of the Board of Directors of [SCB], directly or indirectly, through another individual or entity, or otherwise solicit, entice, persuade, induce or attempt to induce any individual who presently is, or any time during the twelve (12) months preceding the termination of the Broker's employment with [SCB], shall have been a broker of [SCB] . . . to terminate or refrain from renewing or extending [their] employment with [SCB], or to become employed by or enter into contractual relations with any other individual or entity, and [he would not] approach any such broker for any of these purposes or authorize or knowingly cooperate in any manner with the taking of any such actions by any other individual or entity" without SCB's prior written approval.

(h)     His skills, professional experience, and relationships with SCB customers are unique.

(i)     The restrictions in Bronson's EA were reasonably drawn to protect SCB's legitimate business interests, Bronson fully understood them, and they would not preclude him from becoming gainfully employed following a termination of employment by SCB.

(j)     If any of the foregoing covenants were deemed invalid or unenforceable with respect to geographic scope or duration, that scope or duration should be reduced to the extent necessary to make it valid and enforceable and in all other respects should remain in full force and effect.

(k)     Whenever possible, each provision of Bronson's EA should be interpreted in such a manner as to be effective and valid under applicable law. If any provision was held invalid, illegal, or unenforceable for any reason, such holding should not affect any other provision and the agreement should be reformed, construed, and enforced as if such invalid, illegal, or unenforceable provision had never been included.

29.     Bronson and Bracken both signed SCB Employee Handbooks, representing that they understood and agreed that they had access to confidential and proprietary information related to SCB and its clients, could only use this information for business purposes, and would not use this information for personal gains or take or use it when leaving the Company.

30.     Bronson and Bracken both signed and agreed to abide by SCB's Acceptable Use of IT Policy, which imposed restrictions and requirements regarding, among other things: the

use of SCB's IT systems; the use of multi-factor authentication; generating secure passwords, keeping secure passwords confidential, and updating secure passwords; connecting non-SCB devices to the main SCB office network; which devices were approved for conducting the vast majority of SCB business; the messaging systems approved for discussing SCB business; the segregation and confidential storage of CI and CCI; access and use of SCB information while traveling; and security-related escalations.

31. Bronson and Bracken both also completed multiple iterations of SCB's online information technology security training, which covered many of the same topics as the Acceptable Use of IT Policy and focused on how to protect SCB's CI and CCI from external attacks.

### D. Defendants coordinate their exit from SCB and make every effort to undermine the US Ethanol business's ability to compete in the market.

32. In July 2021, Bracken became the head of the US Ethanol business. Bronson reported directly to Bracken. By this time, Bracken and Bronson were close friends.

33. In or about the fall of 2021, upon information and belief, Bracken and Bronson had discussed with each other:

(a)   interfering with SCB's ability to maintain client relationships and retain its substantial market share;

(b)   ending their SCB employment and becoming employed by a competitor of SCB; and

(c)   doing US Ethanol business on behalf of that competitor with the SCB US Ethanol clients they had serviced at, and regarding whom they acquired CCI from, SCB.

34. In or about the fall of 2021, upon information and belief, Bronson and Bracken each encouraged the other to take each of these actions.

35.   In fall of 2021, SCB leadership wanted to expand its US Ethanol business by hiring an additional broker.  A former SCB employee contacted the company expressing interest in joining the US Ethanol business as a broker.  On August 30, 2021, Bronson suggested that Bracken reject his candidacy and Bracken made the decision to reject his candidacy.  After SCB notified the candidate that Bracken would not hire him, the candidate obtained a job as a US Ethanol broker with a competitor of SCB.

36.   On information and belief, Bronson did not advocate for rejecting this candidate with the best interests of SCB in mind.  Rather, Bronson advocated for rejecting this candidate to interfere with SCB's ability to maintain client relationships and retain its substantial market share.

37.   On information and belief, Bracken did not reject this candidate with the best interests of SCB in mind.  Rather, Bracken rejected this candidate to interfere with SCB's ability to maintain client relationships and retain its substantial market share.

38.   On September 21, 2021, Bronson informed SCB's CEO that he was resigning his employment.  During this discussion, Bronson represented that he was leaving the US Ethanol industry.  Later that day, he repeated that representation in a subsequent meeting that included Bracken.  Bronson knew this representation was false, but failed at all times to notify SCB of that fact.  Bracken knew that Bronson's representation was false, but failed at all times to notify SCB of that fact.

39.   On September 24, 2021, Bronson provided to SCB his notice of resignation.  Bronson's EA required that he provide at least 180 days' notice of resignation.  Bronson requested that SCB release him from that notice obligation and instead approve a shorter notice period.

40. Bracken advocated internally for SCB to approve Bronson's request for a shortened notice period and for SCB to provide to Bronson a bonus. On information and belief, Bracken did not advocate for SCB to approve Bronson's request with the best interests of SCB in mind. Rather, Bracken advocated for SCB to approve Bronson's request to interfere with SCB's ability to maintain client relationships and retain its substantial market share.

41. Based primarily on Bronson's representation that he was leaving the US Ethanol industry, and in part on Bracken's recommendation to shorten Bronson's notice period, SCB reduced Bronson's notice period to three months and provided him with a partial bonus. In exchange, Bronson agreed to: (1) reconfirm the validity of the restrictive covenants in his Employment Agreement regarding noncompetition, nonsolicitation of clients and employees, and confidentiality; and (2) acknowledge that because SCB was shortening his notice period from 180 days to three months, the damage caused by any breach by Bronson of those restrictive covenants would be aggravated and considerable. On October 12, 2021, Bronson and SCB executed a letter-agreement containing these terms (the "Letter Agreement").

42. Near the same time, another former SCB employee applied to join the US Ethanol business. SCB's CEO arranged for the candidate to come to Chicago to interview with Bracken in October 2021. Bracken rejected this candidate as well. After SCB notified the candidate that Bracken would not hire him, the candidate obtained a job as an ethanol broker with a competitor of SCB.

43.     On information and belief, Bracken did not reject this candidate with the best interests of
        SCB in mind.  Rather, Bracken rejected this candidate to interfere with SCB's ability to
        maintain client relationships and retain its substantial market share.

44.     Upon information and belief, in late 2021 and during their employment with SCB,
        Bracken and Bronson communicated with former SCB US Ethanol broker Ian Jackson
        about the prospect of working for EOX Holdings LLC ("EOX").  Jackson had worked
        closely with Bronson and Bracken at SCB for several years and, as recently as early
        2021, was the head of SCB's US Ethanol business.  Upon information and belief, in 2021
        Bronson and Bracken had discussed leaving SCB to join EOX.

45.     Jackson's employment with SCB terminated on November 23, 2021.  He registered with
        the National Futures Association as a broker for EOX on February 3, 2022.

        **E.      Defendants leave SCB and immediately join a competitor to set up a
                  competing US Ethanol business with SCB's clients.**

46.     Prior to December 3, 2021, Bracken provided no indication to SCB that he intended to
        leave the firm.  In the prior ten months, SCB promoted him to head of the US Ethanol
        business and paid roughly $8,000 for him to receive personal leadership training from an
        external executive coach.

47.     On December 3, 2021, Bracken gave two-weeks' notice of his resignation.  SCB's CEO
        asked him to postpone his notice for a week so they could discuss further.  Bracken
        refused.

48.     Bracken's resignation was effective Friday, December 17, 2021.  On Tuesday, December
        21, 2021, Bracken registered with NFA as a broker for EOX, a financial services
        competitor of SCB.

49.     Pursuant to the Letter Agreement, Bronson's resignation was effective December 24, 2021. A week later, on December 31, 2021, Bronson registered with NFA as a broker for EOX as well.

50.     On January 5, 2022, based on a communication with an SCB US Ethanol client, SCB became aware that after his employment with SCB, Bronson was in active communication for business purposes with at least one SCB US Ethanol client to whom he had provided services while employed by SCB. The client has not communicated with or done business with SCB since.

51.     Upon information and belief, prior to Bracken and Bronson joining EOX, EOX was not engaged in the US Ethanol market.

52.     On January 14, 2022, SCB reminded Bronson and Bracken of their contractual obligations to SCB. SCB also requested, *inter alia*, that both Bronson and Bracken, respectively, identify each SCB US Ethanol client with whom they interacted during their SCB employment *and* with whom they had also communicated after their SCB employment, including whether and to what extent they had provided brokerage services to any such client after they left SCB. Bronson and Bracken refused to do so.

53.     Upon information and belief, prior to and after their respective resignations from SCB, Bronson and Bracken, directly and indirectly, solicited SCB's US Ethanol clients with whom they had developed relationships and about whom they had obtained Client Confidential Information, to move their US Ethanol business from SCB to EOX. To do so, they leveraged their SCB client relationships, and the CI and CCI SCB had acquired and provided to them during their employment. Bronson and Bracken's efforts were successful. Immediately following their departure from SCB, SCB clients representing

roughly 90% of the firm's US Ethanol revenue ceased doing business with SCB and had moved or began moving their US Ethanol business to EOX. As a result of Bronson and Bracken's unlawful efforts, SCB has lost and will continue to lose millions of dollars of revenue.

54. It will take SCB months to train new US Ethanol brokers and years for those brokers to attempt to rebuild its US Ethanol market share by developing new client relationships. Meanwhile, by virtue of Bronson and Bracken's actions, they and EOX have gained financial windfalls to the direct detriment of SCB that would not have been possible if Bronson and Bracken had complied with their legal duties and contractual obligations to SCB.

## FIRST CAUSE OF ACTION
### (BREACH OF FIDUCIARY DUTY OF LOYALTY - BRACKEN)

55. SCB re-alleges and incorporates all of the above paragraphs as though fully set forth herein.

56. As an employee of SCB, Bracken owed to SCB fiduciary duties including the duty of loyalty.

57. Bracken has breached these duties as set forth in this Complaint by, *inter alia*: (1) usurping business opportunities from SCB; (2) soliciting SCB's US Ethanol customers to move their business from SCB to EOX; (3) soliciting Bronson to leave his employment at SCB and join EOX as a US Ethanol broker; (4) soliciting Jackson to join EOX as a US Ethanol broker; (5) advocating for SCB to shorten Bronson's notice period and pay to Bronson a bonus to which he would not otherwise have been entitled, in part based on Bronson's false promise that he was leaving the US Ethanol industry; (6) failing to disclose to SCB his knowledge that Bronson's promise that he was leaving the US

Ethanol industry after he left SCB's employment was false; (7) rejecting qualified broker candidates for SCB's US Ethanol business for the purpose of hindering SCB's ability to compete in the market.

58. Bracken's breach of these fiduciary duties has proximately caused SCB's injuries.

59. As a result of Bracken's breach of fiduciary duties, the Court should award all legal and equitable relief to which SCB is entitled, including monetary damages, punitive damages, disgorgement of Bracken's ill-gotten gains, and all other relief as more fully set forth below.

### SECOND CAUSE OF ACTION
### (BREACH OF FIDUCIARY DUTY OF LOYALTY - BRONSON)

60. SCB re-alleges and incorporates all of the above paragraphs as though fully set forth herein.

61. As an employee of SCB, Bracken owed to SCB fiduciary duties including the duty of loyalty.

62. Bronson has breached these duties as set forth in this Complaint by, *inter alia*: (1) usurping business opportunities from SCB; (2) soliciting SCB's US Ethanol customers to move their business from SCB to EOX; (3) soliciting Bracken to leave his employment at SCB and join EOX as a US Ethanol broker; (4) soliciting Jackson to join EOX as a US Ethanol broker; (5) falsely promising to SCB that he was leaving the US Ethanol industry in order to obtain a shortened notice period and bonus to which he was not otherwise entitled; and (6) advocating for SCB to reject a qualified broker candidate for SCB's US Ethanol business for the purpose of hindering SCB's ability to compete in the market.

63. Bronson's breach of fiduciary duties has proximately caused SCB's injuries.

64.     As a result of Bronson's breach of fiduciary duties, the Court should award all legal and equitable relief to which SCB is entitled, including monetary damages, disgorgement of Bronson's ill-gotten gains, and all other relief as more fully set forth below.

### THIRD CAUSE OF ACTION
**(BREACH OF CONTRACT (CLIENT NON-SOLICITATION) - BRACKEN)**

65.     SCB re-alleges and incorporates all of the above paragraphs as though fully set forth herein.

66.     As a condition of his employment with SCB, on February 1, 2020, Bracken executed the Bracken EA, a valid and enforceable contract governed by Illinois law.

67.     Pursuant to the terms of the Employment Agreement, Bracken agreed that, during his SCB employment and for six months thereafter, he would not, without the prior written approval of SCB's Board of Directors, solicit, attempt to solicit, or meet with any of the SCB customers with whom he interacted or about whom he learned Confidential Client Information during his SCB employment, for the purposes of offering or accepting goods or services competitive with those offered by SCB.

68.     Bracken unjustifiably and inexcusably breached his obligations under the Employment Agreement by, during and within six months after his employment with SCB, and without obtaining permission from SCB's Board of Directors, soliciting, attempting to solicit, and meeting with the SCB customers with whom he interacted or about whom he learned Confidential Client Information during his employment, for the purposes of offering US Ethanol-related goods and services, competitive with those offered by SCB, to be provided by EOX.

69.     SCB has performed all obligations required of it under the terms of the Employment Agreement.

70.     As a result of Bracken's breach of contract, the Court should award all legal and
        equitable relief to which SCB is entitled, including monetary damages, specific
        performance, and all other relief as more fully set forth below.

## FOURTH CAUSE OF ACTION
### (BREACH OF CONTRACT (CLIENT NON-SOLICITATION) - BRONSON)

71.     SCB re-alleges and incorporates all of the above paragraphs as though fully set forth
        herein.

72.     As a condition of his employment with SCB, on January 6, 2020, Bronson executed the
        Bronson EA, a valid and enforceable contract governed by Illinois law.

73.     Pursuant to the terms of the Employment Agreement, Bronson agreed to refrain from
        soliciting or meeting certain SCB customers for the purposes of offering or accepting
        goods or services similar to or competitive with those offered by SCB, without written
        approval from SCB's Board of Directors, during his employment and for a period of six
        months thereafter

74.     As a condition of receiving a shortened notice period and a bonus for his work in 2021,
        Bronson executed the Letter Agreement.

75.     Pursuant to the terms of the Letter Agreement, Bronson reaffirmed his restrictive
        covenants and acknowledged that because SCB was shortening his notice period
        substantially, the damage caused by any breach of, *inter alia*, the client non-solicitation
        clause would be aggravated and considerable.

76.     Bronson unjustifiably and inexcusably breached his obligations under the Employment
        Agreement and the Letter Agreement, by, during and within 12 months after his
        employment with SCB, and without obtaining permission from SCB's Board of
        Directors, soliciting, attempting to solicit, and meeting with the SCB customers with

whom he interacted or about whom he learned Confidential Client Information during his employment, for the purposes of offering US Ethanol-related goods and services, competitive with those offered by SCB, to be provided by EOX.

77. SCB has performed all obligations required of it under the terms of the Employment Agreement.

78. As a result of Bronson's breach of contract, the Court should award all legal and equitable relief to which SCB is entitled, including monetary damages, specific performance, and all other relief as more fully set forth below.

### FIFTH CAUSE OF ACTION
**(BREACH OF CONTRACT (EMPLOYEE NON-SOLICITATION) - BRACKEN)**

79. SCB re-alleges and incorporates all of the above paragraphs as though fully set forth herein.

80. As a condition of his employment with SCB, on February 1, 2020, Bracken executed the Bracken EA, a valid and enforceable contract governed by Illinois law.

81. Pursuant to the terms of the Employment Agreement, Bracken agreed to refrain from soliciting, enticing, persuading, inducing, or attempting to induce any person who was an SCB Broker within the prior 12 months preceding Bracken's termination, to terminate their SCB employment or become employed by any other entity, without prior written approval of SCB's Board of Directors.

82. Bracken unjustifiably and inexcusably breached his obligations under the Employment Agreement by, during and within 12 months after Bracken's employment with SCB and without obtaining approval from SCB's Board of Directors, (1) soliciting Bronson to terminate his employment with SCB and become employed as a US Ethanol broker by EOX; and (2) soliciting Jackson to become employed as a US Ethanol broker by EOX.

83. SCB has performed all obligations required of it under the terms of the Employment Agreement.

84. As a result of Bracken's breach of contract, the Court should award all legal and equitable relief to which SCB is entitled, including monetary damages, specific performance, and all other relief as more fully set forth below.

## SIXTH CAUSE OF ACTION
### (BREACH OF CONTRACT (EMPLOYEE NON-SOLICITATION) - BRONSON)

85. SCB re-alleges and incorporates all of the above paragraphs as though fully set forth herein.

86. As a condition of his employment with SCB, on January 6, 2020, Bronson executed the Bronson EA, a valid and enforceable contract governed by Illinois law.

87. Pursuant to the terms of the Employment Agreement, Bronson agreed to refrain from soliciting, enticing, persuading, inducing, or attempting to induce any person who was an SCB Broker within the prior 12 months preceding Bronson's termination, to terminate their SCB employment or become employed by any other entity, without prior written approval of SCB's Board of Directors.

88. As a condition of receiving a shortened notice period and a bonus for his work in 2021, Bronson executed the Letter Agreement.

89. Pursuant to the terms of the Letter Agreement, Bronson reaffirmed his restrictive covenants and acknowledged that because SCB was shortening his notice period substantially, the damage caused by any breach of, *inter alia*, the employee non-solicitation clause would be aggravated and considerable.

90. Bronson unjustifiably and inexcusably breached his obligations under the Employment Agreement by, during and within 12 months after Bronson's employment with SCB and

without obtaining approval from SCB's Board of Directors, (1) soliciting Bracken to terminate his employment with SCB and become employed as a US Ethanol broker by EOX; and (2) soliciting Jackson to become employed as a US Ethanol broker by EOX.

91. SCB has performed all obligations required of it under the terms of the Bronson EA as modified by the Letter Agreement.

92. As a result of Bronson's breach of contract, the Court should award all legal and equitable relief to which SCB is entitled, including monetary damages, specific performance, and all other relief as more fully set forth below.

## SEVENTH CAUSE OF ACTION
### (FRAUD IN THE INDUCEMENT - BRONSON)

93. SCB re-alleges and incorporates all of the above paragraphs as though fully set forth herein.

94. On September 21, 2021, when Bronson informed SCB's CEO that he was resigning his employment, Bronson represented to SCB's CEO that he was leaving the US Ethanol industry.

95. Later on September 21, 2021, Bronson repeated this representation to SCB's CEO while Bracken was present.

96. At the times Bronson represented to SCB that he was leaving the US Ethanol industry, Bronson knew that his representation was false.

97. On both occasions, Bronson made this representation to SCB with an intent to induce SCB to shorten his notice period and pay him a bonus.

98. SCB shortened Bronson's notice period and paid him a bonus in justifiable reliance on the truth of his representation that he was leaving the US Ethanol industry.

99.     As a result of Bronson's false representation to SCB that he was leaving the US Ethanol industry, the Court should award all legal and equitable relief to which SCB is entitled, including monetary damages and all other relief as more fully set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

a.  Judgment in SCB's favor and against Defendants Bracken and Bronson on all causes of action alleged herein;

b.  Monetary damages in an amount to be proven at trial, but far in excess of $75,000;

c.  Exemplary and punitive damages for Defendants Bracken and Bronson's willful and malicious actions;

d.  Pre-judgment and post-judgment interest at the maximum rate allowed by law;

e.  An injunction requiring that Bronson and Bracken perform their obligations under their respective employment agreements, with the temporal periods of restriction tolled for the timeframe during which they were out of compliance; and

f.  Such other and further relief as the Court may deem proper.

## JURY DEMAND

Plaintiff hereby demands and requests a trial by jury on all issues so triable.

DATED:  May 24, 2022

Respectfully submitted,

By: _____

Kenneth W. Gage
Alex J. Maturi
PAUL HASTINGS LLP
71 S. Wacker Drive
Chicago, Illinois  60606
Telephone:      1(312) 499-6000
Facsimile:      1(312) 499-6100

kennethgage@paulhastings.com
alexmaturi@paulhastings.com

*Attorneys for Plaintiff SCB Derivatives, LLC*