## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

SCB Derivatives, LLC,

      Plaintiff,

      v.

Andrew Bronson and Kieran Bracken

      Defendants.

Case No. 1:22-CV-2742

Judge John Robert Blakey

### MEMORANDUM OPINION AND ORDER

Plaintiff SCB Derivatives ("SCB") brings various claims against Defendants Andrew Bronson ("Bronson") and Kieran Bracken ("Bracken") arising from an employment dispute. [20]. Plaintiff asserts the following claims against all defendants: (1) breach of fiduciary duty of loyalty (Counts I and II); (2) breach of client non-solicitation agreements (Counts III and IV); and (3) breach of employee non-solicitation agreements (Counts V and VI). *Id.* Plaintiff also asserts a claim of fraudulent inducement against Defendant Bronson (Count VII). *Id.* Defendants move to dismiss all claims for failure to state a claim upon which relief can be granted. [21]. As explained below, this Court denies the motion as to all claims.

### I.    Factual Allegations[1]

SCB is a global commodity and derivatives trading firm specializing in markets related to de-carbonization and low carbon energy alternatives. [20] ¶ 1. Plaintiff

---

[1] For purposes of deciding the motion to dismiss, the Court takes as true the allegations presented in Plaintiff's amended complaint, [20].

operates in a highly competitive industry and invests hundreds of thousands of dollars annually to develop and maintain its client relationships. *Id.* ¶ 12. These relationships take many years to grow, and generally lead to long-term commitments. *Id.* ¶ 13. To help its brokers maintain client relationships, SCB provides its brokers with access to valuable confidential information ("CI") pertaining to SCB's business methods, financial reports, brokerage arrangements, business development targets, and more. *Id.* ¶¶ 14–16. SCB also provides its brokers access to confidential client information ("CCI") which details revenue histories by client, transaction histories, buying and selling preferences, client contact information, and more. *Id.* ¶ 17. SCB's CI and CCI was developed through seven-figure investments spanning several years. *Id.* ¶ 18. In the hands of a competitor, SCB's CI and CCI would unfairly bypass and undermine years of work. *Id.* Thus, SCB took steps to protect its CI and CCI, training brokers on secure usage, restricting access to only those with a clear need, implementing a two-factor authentication system, and requiring brokers to sign agreements on confidentiality, competition, and client solicitation. *Id.* ¶ 19.

SCB opened its Chicago office in 2009 and has since invested significantly in market research to attract long-term clients in its US Ethanol market, one of SCB's eight major markets. *Id.* ¶¶ 11, 14. Defendants Bronson and Bracken were hired as brokers in the US Ethanol market in 2015 and 2017, respectively. *Id.* ¶¶ 20–22. Both Bronson and Bracken began their employment at SCB with no experience in the US Ethanol market and received extensive training to become capable brokers. *Id.* ¶ 20, 21, 24. As brokers, they were responsible for soliciting new clients and maintaining

client relationships by managing trades, analyzing market trends, and more. *Id.* ¶ 23. Defendants accessed large quantities of CI and CCI to perform their duties and occupied "special positions of trust and confidence" within SCB. *Id.* ¶¶ 24, 25. Bracken eventually rose to be the head of SCB's entire US Ethanol business, entrusted with managerial responsibilities over other brokers and increased access to CI and CCI. *Id.* ¶ 27.

Due to the sensitive nature of the CI and CCI, Bronson and Bracken signed agreements acknowledging this information was the property of SCB, and that they would not divulge such information during and after their employment. *Id.* ¶¶ 28–29. Defendants signed agreements that upon their departures and six months thereafter, they would not solicit any of SCB's "current, former, or prospective customers" with whom they interacted or about whom they learned any CCI during their employment. *Id.* Defendants also agreed to not solicit any SCB brokers for twelve months after their departure. *Id.* This included former SCB brokers who had been employed within twelve months prior to Defendants' departures from SCB. *Id.*

SCB alleges that in Fall 2021, Bronson and Bracken began to plot an exit from SCB in which they would interfere with SCB's client relationships while taking clients with them to a competitor. *Id.* ¶ 34. As part of this plot, Defendants rejected qualified candidates to understaff the US Ethanol desk at a time when SCB leadership wanted to expand its US Ethanol business. *Id.* ¶¶ 36–37. On August 30, 2021, Bronson suggested that Bracken reject the candidacy of a former SCB employee, who later obtained a job as a US Ethanol broker with an SCB competitor.

*Id.* ¶ 36.   In October 2021, Bracken rejected another former SCB employee who applied to join the US Ethanol business.  *Id.* ¶ 43.  Similarly, this candidate went on to work as an ethanol broker with an SCB competitor.  *Id.*  Further, Bronson and Bracken approached SCB broker Ian Jackson ("Jackson") in late 2021 about the prospect of working for EOX Holdings LLC ("EOX"), another SCB competitor.  *Id.* ¶ 45.

On September 21, 2021, Bronson informed SCB's CEO that he intended to resign.  *Id.* ¶ 39.  Though Bronson's employment agreement required that he provide 180 days' notice of resignation, Bronson requested a shorter notice period while falsely representing that he intended to leave the US Ethanol industry.  *Id.* ¶¶ 39, 40.  Despite knowing Bronson's representation was false, Bracken advocated for SCB to approve Bronson's request for a shorter notice period while paying him a bonus, and SCB's CEO granted the request.  *Id.* ¶¶ 39, 41.  In exchange for the shorter notice period, Bronson reconfirmed the validity of his restrictive covenants and agreed to aggravated damages upon breach.  *Id.* ¶ 42.

On December 3, 2021, Bracken gave two-weeks' notice of his resignation.  *Id.* ¶ 48.  Bracken turned down the SCB CEO's request to postpone his notice for a week so they could discuss further, and his resignation was effective Friday, December 17, 2021.  *Id.* ¶¶ 48, 49.  Just four days later, on Tuesday, December 21, 2021, Bracken registered with the National Futures Association ("NFA") as a broker for EOX.  *Id.* ¶ 49.  Bronson's resignation became effective three days later on Friday, December 24, 2021.  *Id.* ¶ 50.  Another week later, on December 31, 2021, Bronson similarly

registered with NFA as a broker for EOX. *Id.* Jackson, whose employment with SCB terminated on November 23, 2021, followed Defendants, registering as a broker for EOX on February 3, 2022. *Id.* ¶ 46.

Prior to and after their resignations from SCB, Bronson and Bracken used CI and CCI to solicit SCB's US Ethanol clients to move their business from SCB to EOX. *Id.* ¶ 54. On January 5, 2022, SCB learned that Bronson, working from EOX, was actively soliciting business from an SCB client to whom he had provided services as a SCB broker. *Id.* ¶ 51. The client has not communicated with or done business with SCB since. *Id.* SCB clients representing roughly 90% of the firm's US Ethanol revenue ceased doing business with SCB and moved their business to EOX—a firm that had not engaged in the US Ethanol market prior to Defendants joining EOX. *Id.* ¶¶ 52, 54. SCB has lost and will continue to lose millions of dollars of revenue as a result. *Id.* ¶ 54. It will take SCB months to train new US Ethanol brokers, and years for those brokers to rebuild market share and new client relationships. *Id.* ¶ 55. SCB filed this suit on May 24, 2022, and Defendants now move to dismiss all claims under Rule 12(b)(6) for failure to state a claim.

## II.    Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must provide a "short and plain statement of the claim" showing that the pleader merits relief, Fed. R. Civ. P. 8(a)(2), so the defendant has "fair notice" of the claim "and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint must also contain "sufficient

factual matter" to state a facially plausible claim to relief—one that "allows the court to draw the reasonable inference" that the defendant committed the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). In analyzing a motion to dismiss, a court will construe the complaint in the light most favorable to the plaintiff, accept all well-pled allegations as true, and draw all reasonable inferences in a plaintiff's favor. *See Iqbal*, 556 U.S. at 678; *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 584 (7th Cir. 2021).

## III.  Analysis

### A. Counts 1 and 2 – Breach of Fiduciary Duty of Loyalty

To recover for a breach of fiduciary duty under Illinois law, plaintiffs must establish the existence of a fiduciary duty, a breach of that duty, and damages proximately caused by the breach. *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 709 (7th Cir. 2010). Employees owe a fiduciary duty of loyalty to their employer when acting in an official capacity on behalf of the employer. *Lawlor v. N. Am. Corp. of Illinois,* 983 N.E.2d 414, 433 (Ill. 2012).

Defendants seek to have Counts 1 and 2 dismissed for insufficiently alleging a breach of fiduciary duty, arguing: (1) SCB's allegations of client solicitation involve post-employment conduct which do not implicate a fiduciary duty of loyalty; (2) the facts alleged "on information and belief" are not well-pled and do not permit a plausible inference of liability; and (3) the remaining allegations are merely a "plan to compete" with SCB, which is permissible under Illinois law. [22] at 5–6.

### 1. Post-Employment Conduct

Defendants argue SCB's allegations the Defendants solicited SCB customers merely allege post-employment behavior. [22] at 5. Defendants are correct that an employee's fiduciary duty of loyalty only covers conduct during employment and that this duty cannot be breached solely by conduct occurring after employment was terminated. *See Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F. 2d 1263, 1265 (7th Cir. 1992). Even so, SCB explicitly alleges Bronson and Bracken solicited SCB's US Ethanol clients to move their business to EOX "prior to" Defendants' exit from SCB. [20] ¶ 54. The Complaint also states that "immediately" after Defendants left for EOX, 90% of SCB's US Ethanol business quickly followed, precipitating millions in lost revenue, *id.*, and creating the strong inference Defendants solicited clients for EOX before leaving SCB. *See Geo Grp., Inc. v. Cmty. First Servs., Inc.*, 2012 WL 1077846, at *6 (E.D.N.Y. Mar. 30, 2012) (inferring breach of fiduciary duty at the motion to dismiss stage based partially upon suspicious timing). Defendant's refusal to comply with SCB's request that Defendants identify clients they had worked with during their employment at SCB, and with whom they had also communicated after leaving SCB, *id.* ¶ 53, raises further suspicions that Defendants concealed their solicitation of SCB clients for EOX. These allegations, taken as true, plausibly allege Bronson and Bracken violated their fiduciary duty of loyalty during their terms of employment with SCB by diverting SCB business opportunities and clients to EOX.

### 2. Information and Belief

Next, Defendants take aim at SCB's allegations made "upon information and belief." [22] at 5, 6. Citing no authority, Defendants argue these facts alleged upon information and belief are "completely lacking in well-pleaded facts to permit a plausible inference" the Defendants are liable for "any wrongful conduct." *Id.* at 5. Defendants are mistaken. Plaintiffs may liberally plead facts which are "peculiarly in the control of the defendant" upon information and belief. *Brown v. Budz*, 398 F.3d 904, 914 (7th Cir. 2005). SCB pleads upon information and belief facts related to private conversations and internal motivations of Defendants which could not possibly be available to SCB prior to discovery. *See* [20] ¶¶ 34, 37, 38, 41, 44, 45, 54. Such facts may support a claim for breach of fiduciary duty at the pleading stage, even if they may not ultimately be proven accurate as the case progresses. *See Brown*, 398 F.3d at 914.

Moreover, Defendants mischaracterize the facts supporting SCB's claims. Numerous other facts supporting SCB's claims that Defendants breached their fiduciary duty of loyalty are not pled upon information and belief. SCB alleges Bronson's representation to SCB that he would leave the US Ethanol business was necessary to Bronson obtaining a shorter notice period. [20] ¶¶ 39–42. Bracken also advocated internally for Bronson despite knowing the representation was false. *Id.* ¶ 39. Despite his representation, Bronson then remained in the US Ethanol business. Bronson and Bracken both left SCB just ten days apart from one another and both quickly registered as brokers for EOX, setting up a competing US Ethanol business.

*Id.* ¶¶ 49–51. Just five days after registering as an EOX Broker, and a mere week after leaving SCB, Bronson was soliciting business for EOX from an SCB US Ethanol client. [28] at 3; [20] ¶ 51. 90% of SCB's US Ethanol business immediately followed Defendants to EOX. [20] ¶ 54.

Similarly, at a time when SCB leadership wished to expand its US Ethanol desk by hiring additional brokers, Defendants rejected two qualified candidates, both former SCB employees. *Id.* ¶¶ 36, 43. Both candidates were hired by SCB competitors. *Id.* ¶¶ 36, 43. Both rejections were made to interfere with SCB's ability to maintain client relationships and retain its market share. *Id.* ¶¶ 38, 44. These allegations, taken as true, plausibly allege that Bronson and Bracken violated their fiduciary duty of loyalty.

### 3. Planning to Compete

Finally, Defendants argue that Bronson soliciting Bracken to leave SCB was merely a plan to enter the marketplace in competition, and thus does not constitute a breach of fiduciary duty. Employees are permitted to plan, form, and outfit a competitor while still working for their current employer. *Delta Medical Systems v. Mid-America Medical Systems, Inc.*, 772 N.E.2d 768, 785 (Ill. App. Ct. 2002). Despite this, solicitation of key employees, extraction of confidential information while planning to leave, or any activity which would purposefully undermine a company's ability to compete, surpasses mere planning. *See Aon PLC v. Infinite Equity, Inc.*, 2021 WL 4034068, at *17 (N.D. Ill. Sep. 3, 2021) (collecting cases).

SCB's complaint alleges more than a mere plan to compete but rather, an ostensibly successful plan to undermine SCB's US Ethanol business. Bronson and Bracken used their SCB-provided access to valuable CI and CCI to frustrate SCB's market position. [20] ¶ 54. Defendants also left SCB's US Ethanol desk understaffed to undermine SCB's client relationships, making clients vulnerable to EOX solicitations for business. *Id.* ¶¶ 58, 63. These actions rise beyond a mere plan to compete. These allegations, taken as true, surpass mere planning and plausibly allege Bronson and Bracken violated their fiduciary duty of loyalty to SCB. Defendants' motion to dismiss Counts I and II fails.

### B. Counts 3 and 4 – Breach of Client Non-Solicitation Agreement

To state a claim for breach of contract in Illinois, a plaintiff must allege: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendants; and (4) resultant injury to the plaintiff. *Catania v. Local 4250 of Comm. Workers of Amer.,* 834 N.E.2d 966, 971 (Ill. App. Ct. 2005). Defendants move to dismiss Counts 3 and 4, arguing their non-solicitation agreements are overbroad and thus, unenforceable. Additionally, Defendants argue the complaint "fails to include any well-pleaded facts as to Bracken to permit the plausible inference that Bracken breached the non-solicitation restraint." [22] at 9.

#### 1. Enforceability

Defendants argue the non-solicitation agreements are overbroad and unenforceable as a matter of law, pointing to two aspects of the agreements: (1) the agreements have no geographic scope; and (2) the agreements prohibit Defendants

from soliciting "current, former, or prospective customers" about whom Defendants learned "any Customer information," regardless of whether Defendants had contact with these customers during employment.

In Illinois, a post-employment restrictive covenant is valid and enforceable when it: "(1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee; (2) does not impose undue hardship on the employee-promisor, and (3) is not injurious to the public." *Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 396 (Ill. 2011). The reasonableness of a restrictive covenant is determined "based on the totality of the facts and circumstances of the individual case." *Id.* at 403. Accordingly, "'unless the covenant is patently unreasonable, the parties must be given a full opportunity to develop the necessary evidentiary record.'" *Maximum Indep. Brokerage, LLC v. Smith*, 218 F.Supp.3d 630, 637 (N.D. Ill. 2016) (citing *Traffic Tech, Inc. v. Kreiter*, No. 14-cv-7528, 2015 WL 9259544, at *5 (N.D. Ill. Dec. 18, 2015)). Courts in this district have found that "such a fact-based determination is not appropriate at the motion to dismiss stage." *Maximum Indep.*, 218 F.Supp.3d at 637 (collecting cases).

First, the absence of a geographical restriction "does not automatically invalidate a postemployment restraint where the geographical prohibition is qualified by an activity restraint." *Id.* at 637–38 (quoting *Eichmann v. Nat'l Hosp. and Health Care Services, Inc.*, 719 N.E.2d 1141, 1147 (Ill. App. Ct. 1999)). Covenants containing "no geographic limitation have been upheld as reasonable where the purpose of the restriction was to protect the employer from losing customers to a

former employee who, by virtue of his employment, gained special knowledge and familiarity with the customers' requirements." *Eichmann*, 719 N.E.2d at 1147. Yet such covenants must still be constrained with an activity restraint "reasonably related to the employer's interest in protecting customer relations that its employees developed as a direct result of the employment." *Id.*

Second, the mere inclusion of the term "prospective customers" does not render a restraint per se unenforceable. Defendants cite *Turnell v. CentiMark Corp.*, where the court held that a restraint against contacting prospective customers two years after employment was overbroad and unenforceable. 796 F.3d 656, 665–66 (7th Cir. 2015). But the *Turnell* court applied Pennsylvania law, not Illinois law, on a restraint where the employee had no connection—neither contacts nor knowledge of confidential information—to prospective customers. *See id. generally*. What's more, the *Turnell* court noted other courts around the country had enforced "similar agreements barring solicitation of prospective customers." *Id.* at 666 (collecting cases).

An analysis of a covenant under *Reliable Fire* is not a scavenger hunt where terms like "prospective customers" or the absence of a geographic limitation are viewed in a vacuum, rendering a covenant unenforceable. Rather, these terms are read together with additional contextual restraints. Here: (1) the covenants last for six months after the term of Defendants' employment agreement; and (2) these prospective customers must be those with whom Defendants interacted or about whom Defendants learned confidential client information during their employment.

The scope of a restraint tied to confidential information is further contextualized by the scope of that confidential information itself. *See Carlson Group, Inc. v. Davenport*, No. 16-CV-10520, 2016 WL 7212522, at *5 (N.D. Ill. Dec. 13, 2016). Here, SCB alleges its CCI, developed through years of work and seven-figure financial investments, is extremely valuable, highly potent in the hands of a competitor, and thus, closely guarded. This CCI detailed revenue histories, client transaction details, buying and selling preferences, selling price relationships, and more—information that would allow a competitor to quickly undermine SCB. [20] ¶ 17. The CCI also concerns clients with whom SCB took years to develop relationships, and these client relationships typically span several years. *Id.* ¶ 13. The loss of a customer relationship would cause significant and irreparable harm to SCB. *Id.* ¶ 28. To protect its CCI, SCB required its brokers to sign confidentiality agreements, allowed access only by SCB hardware, used IT security measures, and restricted access to only those with a clear need. *Id.* ¶ 19.

SCB also had legitimate business interests to protect, and its non-solicitation agreements are not patently unreasonable in protecting those interests. The covenant's reach also reflects the global nature of Defendants' work as brokers in a global market for US Ethanol. *See GemShares LLC v. Lipton*, No. 17-C-6221, 2019 WL 3287838, at *2 (N.D. Ill. July 21, 2019) (the lack of a geographic limitation did not render a non-compete provision unenforceable as Plaintiff's business involved "global financial markets"). This global reach is then constrained by the six-month term of restriction. *See OptionsCity Software, Inc. v. Baumann*, No. 15 C 5019, 2015

WL 3955622, at *4 (N.D. Ill. June 19, 2015) (an 18-month restrictive covenant was "ostensibly reasonable" as "Illinois courts uphold restrictive covenants that last for years"). Next, the restriction applies to current, former, and prospective customers with whom Defendants interacted or about whom Defendants learned CCI during their employment. Just as the *Eichmann* court was concerned about employers "losing customers to a former employee who, by virtue of his employment, gained special knowledge," SCB constrained its global covenant to protect vulnerable, years-long client relationships about whom Defendants learned valuable CCI while employed by SCB. 719 N.E.2d at 1147. SCB's covenants are not categorically unenforceable. Ultimately, the reasonableness of the non-solicitation covenants depends "on the specific facts and circumstances of this individual case—facts that still must be developed." *American Transport Grp. v.* Power, No. 17-C-7962, 2018 WL 1993204, at *5 (N.D. Ill. Apr. 27, 2018). Accordingly, Defendants' motion to dismiss Counts 3 and 4 fails.

### 2. Allegations of Client Solicitation

Defendants argue in the alternative that SCB's Third Cause of Action against Bracken fails because the Amended Complaint does not "include any well-pleaded facts as to Bracken to permit the plausible inference that Bracken breached the non-solicitation restraint." [22] at 9. Defendants then claim, "there are simply no general factual allegations in the FAC that support the claim." [28] at 7. Not so. Plaintiffs may liberally plead facts which are "peculiarly in the control of the defendant" upon information and belief. *Brown*, 398 F.3d at 914. Here, SCB alleges that "prior to and

after their respective resignations from SCB, Bronson and Bracken, directly and indirectly, solicited SCB's US Ethanol clients" they had worked with and about whom they had obtained CCI to move their business to EOX. [20] ¶ 54. That 90% of SCB's US Ethanol business rapidly followed Defendants to EOX, a firm that previously had not been engaged in the US Ethanol market, permits a plausible inference that Defendants breached their non-solicitation restraint. *Id.* ¶¶ 33, 52, 54; *see also Traffic Tech, Inc.*, 2015 WL 9259544, at *7 (allegations that clients ceased working with Plaintiff shortly after Defendant's departure contained sufficient facts to state a claim to relief that is plausible on its face.). These facts, taken as true, satisfy SCB's minimal burden at this stage and Defendants' motion to dismiss Count 3 fails.

### C. Counts 5 and 6 – Employee Non-Solicitation

Defendants then argue the employee non-solicit (or "anti-raiding") provision is unenforceable "as a matter of law" due to a lack of geographic scope, and is overbroad as it restricts solicitation of anyone who had worked as an SCB broker within 12 months preceding Defendants' departures. [22] at 10–11. In the alternative, Defendants argue SCB failed to allege a breach of the agreements. *Id.* at 11.

#### 1. Enforceability

As explained above, post-employment restraints are not automatically invalidated for lack of a geographic scope. *Eichmann*, 719 N.E.2d at 1147. To the contrary, courts applying Illinois law have upheld anti-raiding restraints with no geographic scope while covering a broad category of employees. In *Arpac Corp. v. Murray*, the court found that employers had a legitimate business interest in

maintaining a stable workforce, protectable by an anti-raiding restraint. 589 N.E.2d 640, 650 (Ill. App. Ct. 1992). The court noted that Arpac operated in a highly specialized and competitive market, employed workers with specialized skills, and spent an "absolute fortune" on developing long-term client relationships. *Id.* at 648. The court found Arpac's anti-raiding provision, prohibiting the solicitation of *any* employees for a period of *two years*, enforceable and reasonably calculated to protect Arpac's interests. *Id.* at 650. Similarly, in *Integrated Genomics, Inc. v. Kyrpides*, the court upheld an anti-aiding provision without geographic scope while prohibiting the solicitation of "*any* employee or employees of the Company." No. 06-C-6706, 2010 WL 375672, at *10 (N.D. Ill. Jan. 26, 2010) (emphasis added). There, the employer was also protecting highly skilled employees—"world experts in microbial genome analysis and metabolic reconstruction"—whose loss would significantly impact the company. *Id.* at *4.

Here, SCB's anti-raiding provision is both shorter in duration and covers a smaller category of employees than those of *Arpac* and *Integrated Genomics, Inc.*, applying for six months and only to its brokers. Notably, there are significant similarities between SCB brokers and the highly specialized employees of *Arpac* and *Integrated Genomics, Inc.* SCB brokers are hired into special positions of trust, accessing large quantities of confidential information. [20] ¶ 25. SCB invests "significant time and substantial resources over a prolonged period" to train brokers who may have no prior experience in their assigned markets. *Id.* ¶¶ 20, 21, 24. These brokers then maintain client relationships that "take multiple years to develop and,

once established, span several years." *Id.* ¶ 13. The impact of the brokers' loss is also significant as it will take SCB "months to train new US Ethanol brokers and years for those brokers to attempt to rebuild its US Ethanol market share." *Id.* ¶ 55. Given these striking similarities, whether such a restraint is ultimately reasonable would require this Court to make a fact-based determination inappropriate at the motion-to-dismiss stage. *Maximum Indep. Brokerage, LLC*, 218 F.Supp.3d at 637. The anti-raiding restraint is not patently unenforceable, and Defendants' motion to dismiss Counts 5 and 6 for an unenforceable restraint fails.

### 2. Allegations of Employee Solicitation

Defendants renew their arguments that these counts must be dismissed as SCB relies on facts alleged "upon information and belief." Just as Defendants' identical arguments failed for Counts 1 through 4, they fail here too. The facts surrounding Defendants' solicitation of Jackson are peculiarly within their control, making these facts especially appropriate for SCB to plead upon information and belief. *Brown*, 398 F.3d at 914.

Here, SCB properly alleged Defendants solicited a former SCB broker in violation of their anti-raiding provision. Jackson falls squarely among employees covered by the provision, having worked at SCB as a broker until November 23, 2021, approximately a month prior to Defendants' departures from SCB. [20] ¶¶ 45–46, 49–50. Jackson also worked closely with Bronson and Bracken at SCB for years, and he had been the head of SCB's US Ethanol business. *Id.* ¶ 45. In 2021, Defendants communicated with Jackson about working for EOX and Jackson eventually joined

the Defendants at EOX on February 3, 2022. *Id.* ¶ 45–46. These facts, taken as true, properly allege Defendants breached the anti-raiding provision of their employment agreements.

SCB also properly alleged Defendants solicited one another to join EOX in violation of the anti-raiding provision. Defendants argue "Bracken could not have solicited Bronson." [22] at 11. Defendants cite to no authority and instead point to the timeline: Bronson sought to leave SCB on September 21, 2021, while Bracken sought to leave SCB on December 3, 2021. *Id.* at 6. In the alternative, Defendants claim such allegations describe a mere plan to compete, not actionable under Illinois Law. *Id.* at 11.

Defendants owed SCB a duty not to solicit employees—including one another—away from SCB while employed at SCB. *See Integrated Genomics, Inc.*, No. 06-C-6706, 2010 WL 375672, at *12 ("Kyrpides could be found to have breached his fiduciary duty of loyalty to Integrated if he solicited Ivanova to join JGI while both were still employed by Integrated."); *see also Lincoln Park Sav. Bank v. Binetti*, No. 10 CV 5083, 2011 WL 249461, at *5 (N. D. Ill. Jan. 26, 2011) ("Binetti owed LPSB a duty of loyalty while employed by it, which included the duty not to solicit . . . co-workers away from LPSB."). SCB properly alleges that in 2021, Defendants discussed leaving SCB to join a competitor, doing US Ethanol business on behalf of that competitor with SCB clients, while encouraging one another to take these actions. [20] ¶¶ 34–35. Bracken also took additional action to entice Bronson's exit from SCB, persuading SCB to shorten Bronson's notice period while paying Bronson

a bonus. *Id.* ¶ 41. Taking these facts as true, the Amended Complaint plausibly pleads Defendants breached the anti-raiding provision. Defendants' motion to dismiss Counts 5 and 6 fail.

### D. Count 7 – Fraudulent Inducement

Defendants move to dismiss Count 7, a claim against Bronson for fraud in the inducement. The elements of fraudulent inducement are: "(1) a false statement of material fact; (2) known or believed to be false by the party making it; (3) made to induce the other party to act; (4) action by the other party in justifiable reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 681 (1989). Parties alleging fraud "must state with particularity the circumstances constituting fraud or mistake," although "malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011). Defendant Bronson challenges Plaintiff's claim for two reasons: (1) that the alleged false statement of material fact related only to future conduct; and (2) that it was not alleged with sufficient particularity to satisfy Rule 9(b).

Defendants describe Bronson's statement that he was "leaving the US Ethanol industry" as solely an alleged promise of future conduct. [22] at 13. Under Illinois law, "statements regarding future events or circumstances" are not a basis for fraud and are "mere expressions of opinion or mere promises or conjectures upon which the

other party has no right to rely." *Hoffman v. Nationwide Mut. Ins. Co.*, No. 10-cv-3841, 2011 WL 3158708, at *7 (N.D. Ill. Jul. 26, 2011) (citation omitted). But Illinois law also recognizes a well-established exception: "a promise to perform an act accompanied by an intention not to perform is a misrepresentation upon which fraud can be based 'if the false promise or representation of future conduct is alleged to be the scheme employed to accomplish the fraud.'" *Hassan v. Yusuf*, 944 N.E.2d 895, 914 (Ill. App. Ct. 2011). This exception particularly applies to situations "where a party makes a promise of performance, not intending to keep the promise, but intending for another party to rely on it, and where the other party relies on it to his detriment." *Bower v. Jones*, 978 F.2d 1004, 1011 (7th Cir. 1992).

Bronson's alleged actions are precisely what the *Bower* court described. Bronson approached SCB's CEO, falsely representing he was leaving the US Ethanol industry entirely. [20] ¶ 39. Bronson made that false representation intending to induce a shorter notice period from SCB while still being paid a bonus. *Id.* ¶ 40, 42. SCB indeed shortened Bronson's notice period and paid a bonus in reliance on the truth of his representation. *Id.* ¶ 42. And indeed, Bronson's representations were false, with Bronson registering as a US Ethanol broker for EOX a mere week after leaving SCB. *Id.* ¶ 50.

Defendants argue Bronson's statement falls outside the exception because the scheme "alleged in the FAC was not a scheme to reduce the 180-day notice period to 90 days." [28] at 9–10. But this misses the broader scheme for which Bronson's statement was necessary. SCB alleges the scheme was for Defendants to leave SCB

and quickly set up a competing business at EOX.  [20] ¶ 54.  An integral part of that scheme was that Defendants could time their departures to coincide, necessitating a shorter notice period, and for which Bronson's false statement was made to accomplish.  Under these circumstances, SCB properly alleged its fraudulent inducement claim against Bronson.

Defendants argue in the alternative that SCB's fraudulent inducement claim fails Rule 9(b) pleading standards as it "consists entirely of conclusory, self-serving allegations that do nothing more than recite the necessary elements in cursory fashion." [22] at 13.  Not so.  SCB alleged that on September 21, 2021, Bronson falsely represented to SCB's CEO that he would leave the US Ethanol market entirely to induce a shorter notice period and a bonus so Bronson could join Bracken at EOX. [20] ¶¶ 39–40.  Under these facts, SCB sufficiently described the "who, what, when, where, and how" of its fraudulent inducement claim, satisfying Rule 9(b).

Defendants also argue SCB's fraudulent inducement claim falls short of Rule 9(b) as it "fails to plead any facts in support of Plaintiff's speculative allegation of Bronson's fraudulent intent." [22] at 14.  Defendants cite two cases for this contention.  Yet in *Tricontinental*, the allegations fell short of pleading requirements "*against accountants*" because they failed to "identify what the accountant had to gain by covering up (or being complicit in) the fraud of their clients." *Tricontinental Indus. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 841 (7th Cir. 2007) (emphasis added). In *Grove*, the complaint failed to "provide even a single factual allegation indicating fraudulent intent." *Grove v. Gilman Securities, Inc.*, No. 95-1606, 1996 WL 18893, at

*3 (N.D. Ill. 1996). In contrast, SCB met its burden here, alleging Bronson intended to remain in the US Ethanol business, made his representation to remain in the US Ethanol business, induced a shorter notice period and a bonus, and did in fact remain in the US Ethanol business. Accordingly, Defendants motion to dismiss Count 7 fails.

## IV. Conclusion

For the reasons explained above, the Court denies Defendants' motion to dismiss [21]. Defendants shall answer the amended complaint [20] by October 20, 2023. Additionally, the parties shall file a joint status report by October 30, 2023, proposing a reasonable fact discovery deadline, indicating whether they will require expert discovery, and indicating whether they are interested in a settlement conference with the assigned Magistrate Judge. This Court will set additional case management deadlines in a future order.

Date: September 29, 2023                    Entered:

                                           John Robert Blakey
                                           United States District Judge